IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| DELINDA MORRISON, | | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No. JFM-10-2775 |
| | * | |
| MICHAEL ASTRUE, | * | |
| Commissioner, | * | |
| Social Security Administration | * | |
| | * | |
| Defendant | * | |
| | * | |
| | * | |

****** 

<u>MEMORANDUM</u>

DeLinda Morrison ("Morrison") brings this employment discrimination and retaliation action against her former employer, the Social Security Administration ("SSA"). Morrison alleges the SSA unlawfully removed her from her position as an IT specialist based on race and gender discrimination and in retaliation for pursuing a complaint with the Equal Employment Opportunity Commission ("EEOC"), in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e, et seq. Defendant Michael J. Astrue ("Astrue"), Commissioner of the Social Security Administration, has now filed a motion to dismiss or for summary judgment pursuant to Rules 12(b)(1), 12(b)(6), and 56 of the Federal Rules of Civil Procedure. The issues have been fully briefed, and no hearing is necessary. *See* Local Rule 105.6. For the reasons set forth herein, defendant's motion will be treated as one for summary judgment, and it will be granted.

1

BACKGROUND

Plaintiff DeLinda Morrison ("Morrison"), a black woman, began working as an

Information Technology ("IT") specialist with the Social Security Administration ("SSA") in

March of 1999.  (Pl.'s Aff. at 1, ECF No. 20-68.)  From March 1999 to July 2007, Morrison

remained in the same position with the Division of Management Information Development.[1]

(Compl. ¶ 7, ECF No. 1.)  During her time in the Information Development branch, Morrison

received satisfactory performance reviews.  (May 18, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 31,

Nicodemus's Test., ECF No. 20-86.)  In July 2007, Morrison volunteered to work part-time in a

different branch of the SSA, Release Planning.  (June 10, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at

517–18, Pl.'s Test., ECF No. 20-88.)  From July 2007 to September 2007, Morrison spent half

her hours in Release Planning and half in the Information Development branch.  (June 10, 2010

Merit Sys. Prot. Bd. Hr'g Tr. at 518, Pl.'s Test.)  At the end of September 2007, Morrison's

supervisor in Information Development, Annemarie Nicodemus ("Nicodemus"), a white woman,

offered Morrison the opportunity to voluntarily transfer permanently to the Release Planning

division under Branch Supervisor Pam Ellison ("Ellison"), also a white woman.  (*Id*. at 523.)

Morrison accepted the opportunity as a way to "broaden [her] horizon."  (*Id*. at 524.)

After moving into the Release Planning division full-time, Morrison's duties changed.

(June 10, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 524, Pl.'s Test.)  Rather than doing computer

programming as she had been in the Information Development branch, her new duties involved

using Excel spreadsheets to track software development progress prior to release.  (*Id*. at 525–

28.)  Before moving to the Release Planning division, Morrison had little, if any, experience

---

[1] The Division of Management Information Development was later reorganized as the Division
of Title II Notices and Management Information.  (Compl. ¶ 7.)  For the sake of clarity, I will
refer to this division as the Information Development branch throughout.

using Excel. (*Id.* at 534; May 18, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 22–23, Nicodemus's

Test.) Morrison's direct supervisor, Bob Myers, a white man, trained her in her new position for

approximately six months, working side-by-side with her for four to five hours a day, so that she

could follow along as he did work that would eventually become her responsibility. (May 19,

2010 Merit Sys. Prot. Bd. Hr'g Tr. at 258, Myers's Test.) Following Morrison's six months of

training, she asked both Myers and Ellison for training in Excel, and they said she would not

need formal training because she would just "pick it up." (June 10, 2010 Merit Sys. Prot. Bd.

Hr'g Tr. at 534, Pl.'s Test.) Tammy Meisner, a white woman who was already in Release

Planning when Morrison arrived, received ongoing training for over a year (from Sheila Jones, a

black woman) before being promoted from GS-12 to GS-13. (*Id.* at 678.) Unlike Morrison,

Meisner had limited experience in the IT field when she started in Release Planning. (Pl.'s Aff.

at 5.)

During the first few months of working for Ellison, Morrison and Ellison engaged in

occasional casual conversation, with Morrison discussing her daughter, and Ellison sharing

stories about her two dogs. (May 18, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 137–38, Ellison's

Test.) On February 3, 2008, Morrison got a call from her daughter's school, saying that her

teenage daughter, who was pregnant, had been sent to the emergency room. (June 10, 2010

Merit Sys. Prot. Bd. Hr'g Tr. at 540, Pl.'s Test.) Morrison submitted a leave slip and went to the

hospital. (*Id.* at 541.) The next day, when Morrison returned to work, she shared with Ellison

that her daughter was pregnant. (*Id.*) Ellison responded by saying "I thought your daughter

didn't do anything," to which Morrison responded, "Well, you know how teenagers are." (*Id.*)

Ellison later asked if Morrison knew who the father was and who was going to keep the baby.

(*Id.*) Morrison declined to answer these questions, saying that it would not be an issue. (*Id.*)

Morrison participated in the February software release weekend without any indication of problems with her performance.  (*Id*. at 540–42.)  Two months later, during a routine six-month performance appraisal on April 21, 2008, Ellison met with Morrison to express concern about the steep learning curve in Morrison's new position and informed her that she was not performing successfully on a number of her responsibilities.  (*Id*. at 548; May 18, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 71, Ellison's Test.)  In particular, Ellison was concerned with Morrison's ability to meet deadlines and to communicate her status in a timely manner, so that Ellison could report to upper management.  (May 18, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 71, Ellison's Test.)  Ellison perceived that Morrison was having trouble understanding her assigned tasks and prioritizing her various responsibilities, (*id*. at 72–73), problems Ellison considered to fall under the job requirements of "Demonstrates Job Knowledge" and "Achieves Business Results."  (*Id*. at 72.)  Concerned that Morrison's work might suffer as a result of her daughter's pregnancy, Ellison said, "I know you're having a baby in the house, and I don't want that to be a problem, but I know how that can come up, because I have two dogs."  (June 10, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 548, Pl.'s Test.)  Morrison claims that Ellison's statements indicate racial stereotyping "fitting the derogatory assessment commonly attributed to African American women as sexually promiscuous and as parents having children out of wedlock."  (Compl. ¶ 10.)

By the end of May, Morrison's formal training period was considered complete, and she was expected to work independently on her assignments.  (May 18, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 74, Ellison's Test.)  Prior to the May release, Morrison reminded Ellison that her daughter's due date was in June and that she would be taking a week off for that.  (June 10, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 551, Pl.'s Test.)  Morrison then participated in the May release weekend, tracking the software and covering the Command Center for one of the shifts.  (May

18, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 76, Ellison's Test.)  Ellison contends that she received a call from the Release Manager during the weekend, saying that the Command Center was not performing and that there were people not doing anything at all.  (*Id.*)  Ellison felt that it was Morrison's responsibility to address those issues and that her failure to do so was an indication that she could not handle that responsibility going forward.  (*Id.* at 77.)

Morrison's daughter delivered a baby boy June 12.  (June 10, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 551, Pl.'s Test.)  Morrison came in to work the next day, June 13, and then took time off until June 23.  (*Id.*)  Morrison claims that upon her return to work June 23, she encountered hostility from Ellison.  (*Id.*)  During a status meeting with other staff members, Ellison publicly berated Morrison for allegedly not living up to her responsibilities and creating work for other people.  (*Id.* at 552–53.)  Morrison felt that Bob Myers, her direct supervisor, had agreed with Morrison's approach but failed to defend her when Ellison criticized her work.  (*Id.*)  When Morrison confronted Myers after the meeting, Ellison intervened and said Morrison should not accuse Myers of anything and should come to her directly with any problems because Ellison was Morrison's branch supervisor.  (*Id.* at 554.)  Morrison avers that her working relationship with Ellison deteriorated significantly following her absence for her grandson's delivery.  (*Id.* at 555.)

In July 2008, Ellison gave Morrison an unfavorable optional performance assessment, (*id.* at 556), noting that Morrison was still having difficulty with the same problems that had been addressed in the April review.  (May 18, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 77–78, Ellison's Test.)  Ellison suggested that perhaps the new baby was having an effect on Morrison's performance.  (June 10, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 558, Pl.'s Test.)  Morrison disagreed with the performance appraisal and refused to sign it.  (*Id.* at 559.)  Morrison felt that

Ellison only gave her the optional performance appraisal because Ellison had a "master slave mentality" toward Morrison.  (*Id.* at 693–95.)

Subsequently, Morrison spoke with the Division Manager, Bryant Chase ("Chase"), a black male, and requested a transfer, which was denied.  (Pl.'s Aff. at 7.)  Chase testified that following the performance review in July, Morrison approached him to express her disagreement with the appraisal.  (May 18, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 217, Chase's Test.; June 10, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 560, Pl.'s Test.)  According to Chase, when Morrison approached him to request a transfer in July, she was already under the Performance Assistance Plan ("PAP"), which meant that he could not recommend her for transfer.  (May 18, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 208–11, Chase's Test.)  Morrison disputes Chase's testimony that she was already under the PAP and acknowledges only that the possibility of being placed under official review arose during the July appraisal discussion.  (June 10, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 561, Pl.'s Test.)

On August 4, 2008, Ellison officially placed Morrison on a 30-day PAP because of allegedly ongoing deficient work product, suggesting that the new baby might be making her sleep-deprived.  (Compl. ¶ 12c.)  According to the PAP, Morrison had to demonstrate successful performance during the 30-day period to avoid management moving to the next step, a 120-day Opportunity to Perform Successfully ("OPS").  (May 18, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 79, Ellison's Test.)  Morrison was given a written copy of the PAP, which laid out the areas in which she was allegedly having difficulty and what was expected of her to show sufficient improvement.  (*Id.* at 80.)

Among the problems attributed to Morrison was difficulty with proper flagging of emails in the common mailbox. (*Id.* at 81.) A color-coding system, which was outlined in a shared document and discussed at status meetings, was used to identify whether an email required action, was informational, or was completed. (*Id.* at 81–82.) Ellison claims that, despite having it explained many times, Morrison had difficulty with proper flagging of the email inbox. (*Id.* at 82.) Morrison disputes that she had any problems and attributes any incorrect flagging to Ellison, who Morrison claims deliberately changed and moved Morrison's work from the shared mailbox. (Pl.'s Aff. at 5.) Morrison further alleges that Ellison was responsible for changing and moving work done by Tatia Little and Toni Marshall, both of whom are black women who had altercations with Ellison before their work allegedly began to disappear from the mailbox or a common folder. (*Id.*)

Morrison's direct supervisor, Bob Myers ("Myers"), avers that, despite clear instructions from Ellison, Morrison was only able to accomplish some of her assigned work independently. (May 19, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 263, Myers's Test.) As a result, Myers was not able to turn over as much work to Morrison as had been anticipated when Morrison first transferred to Release Planning. (*Id.*) Morrison required significant follow up, and Myers believed that certain work was too critical to be placed in Morrison's control. (*Id.* at 264.) Ellison claims that she was also uncomfortable giving Morrison responsibility over critical tasks, such as the Words Document, a tracking tool used to follow the timelines of events to occur over the course of a software release weekend. (May 18, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 74, Ellison's Test.)

Bryant Chase testified that he was present at three or four meetings in which Ellison was giving a status update based on Morrison's reports, and employees from other branches objected

that Morrison's report did not include the most up-to-date information.  (May 18, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 208–11, Chase's Test.)  Chase avers that, as a manager, he would be critical of such performance.  (*Id.* at 211.)

As part of the PAP, Morrison was given a mentor, Charlotte Bark, a white woman.  (June 10, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 696, Pl.'s Test.)  During the 30-day period, Morrison was expected to contact Bark with any questions.  (*Id.*)  Bark observed that Morrison "did not demonstrate an understanding of her responsibilities and was not able to achieve expected business results."  (Bark Aff. at 1, ECF No. 20-72.)  Specific examples cited include showing up late to required status meetings, sitting in the back rather than taking the lead, coming unprepared and without notes, and demonstrating an inability to prioritize and manage her time appropriately according to project timelines.  (*Id.* at 1–2; May 19, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 297, Bark's Test.)  Despite specific information about how to track progress and what her responsibilities were, Morrison was unable to complete tasks as requested and was unwilling or unable to incorporate suggested methodologies to improve her performance.  (Bark Aff. at 2.)  Bark avers that Morrison's "job was much more clearly defined than jobs being performed by other employees with the same grade."  (*Id.* at 3.)  After meeting with Morrison roughly 12 times, totaling 14 or 16 hours, Bark felt that Morrison did not make any progress.  (May 19, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 297, Bark's Test.)  As a former GS-12 performing work similar to Morrison's responsibilities, Bark testified that Morrison's skill level "was not anywhere near what [she] would have expected" despite more specific instructions than would normally be given to someone at Morrison's level.  (*Id.* at 299.)

After the 30-day PAP was put in place on August 4, Morrison contacted the SSA Equal Employment Opportunity Office ("EEO") on August 14, 2008, alleging that the heightened

criticism of her performance was factually unwarranted and based on unlawful discrimination. (Compl. ¶ 14.)  On September 2, 2008, Morrison spoke with Chase and made her second request for reassignment.  (Pl.'s Aff. at 7.)  Chase again denied the request, saying he could not consider a transfer while Morrison was under review.  (May 19, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 216, Chase's Test.)

On September 8, 2008, Morrison was deemed to have failed to improve sufficiently during the PAP and was given an Opportunity to Perform Successfully ("OPS").  (Pl.'s Opp'n to Mot. to Dismiss or for Summ. J. at 9.)  Under the OPS, which would remain in place for 120 days, Morrison was given another chance to improve consistent with performance expectations. (*Id*.)  If she did not, she would either be reassigned, reduced in grade, or removed from federal service.  (*Id*.)  The OPS provided Morrison a new mentor, Mary DeTota, a white woman, who observed that Morrison made the same types of errors over and over again.  (DeTota Aff. at 2, ECF No. 20-73.)  Despite meeting several times to discuss a spreadsheet tracking method, Morrison did not grasp the concept.  (*Id*.)  DeTota is of the opinion that Morrison had adequate information and experience to handle this task without making mistakes, and yet she failed to do so.  (*Id*.)

During the OPS, Ellison scrutinized Morrison's work very closely.  (Compl. ¶ 15.)  At Morrison's request, Ellison's instructions were all communicated by email, and Ellison engaged in performance discussions about Morrison's progress or lack thereof.  (May 18, 2010 Merit Sys. Prot. Bd. Hr'g Tr., at 114, 121, Ellison's Test.)  Ellison kept detailed notes of Morrison's performance and their interactions throughout the OPS period.  (*Id*.; Def.'s Mot. to Dismiss or for Summ. J., Ex. 12, 16–19, 22–26, 28, 30, 32–33, 35–36, 38–47.)  Ellison found Morrison's status updates and reports to be untimely and inaccurate and communicated these alleged failings

to Morrison by email and in performance review meetings attended by Morrison's mentor and occasionally a union representative.  (May 18, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 114–27, Ellison's Test.)  Morrison continued to misunderstand the color-coding system for the spreadsheets, causing her to submit untimely tracking documents.  (*Id*. at 123.)  In addition, Ellison felt that Morrison was still experiencing difficulty with proper flagging of the email inbox.  (*Id*. at 126.)  Ellison claims that she was required to stay late or work weekends to finish her own work because of the time she spent reviewing Morrison's work.  (*Id*. at 125.)

By the end of the OPS, Ellison determined that, though Morrison occasionally exhibited some initiative and improvement, even occasionally "vast improvement" in some areas, she continued to make the same mistakes repeatedly and had not improved to a point where she was able to work independently.  (*Id*. at 117.)  According to Ellison, Morrison was still lacking in the areas of "Job Knowledge" and "Achieves Business Results."  (*Id*. at 125.)

Morrison disputes Myers's, DeTota's, Bark's, Chase's, and Ellison's assessments of her performance.  (June 10, 2010 Merit Sys. Prot. Bd. Hr'g Tr. at 707, Pl.'s Test.)  Moreover, Morrison testified that when Bob Myers, her supervisor, made mistakes, Ellison corrected him in front of 30 or 40 people at a status meeting, but Morrison felt he generally received more favorable treatment from Ellison when he made mistakes.  (*Id*. at 679–80.)  Though other employees made mistakes, Ellison did not place them under performance review.  (*Id*. at 681.)  Tatia Little, a friend of Morrison's who worked in another division in another building, submitted an affidavit regarding Morrison's experience.  (*See* Little Aff. at 1, ECF No. 20-75.)  Little claims that Morrison felt attacked by the way Ellison was treating her and, as a result, Morrison was not as pleasant as she would have been because of the hostile environment.  (*Id*. at 2.)  Morrison showed Little Ellison's emails and the spreadsheets that were allegedly incorrect.

(*Id.*)  Little testified that from the spreadsheets it looked like "[Morrison] was keeping on top of it."  (*Id.*)  Janet Maszaros, a computer specialist team leader who worked with Morrison in 2000 or 2001 and subsequently had only "a few contacts with [Morrison] over the course of a few months," found Morrison to be "professional, knowledgeable" and prompt in responding to her requests.  (Maszaros Aff. at 1–2, ECF No. 20-77.)

During the OPS period, the EEO issued a Notice of Right to File, and Morrison formally filed her discrimination complaint November 24, 2008.  (Def.'s Mot. to Dismiss or for Summ. J. at 9, ECF No. 19.)  At the end of the OPS period, on February 6, 2009, Morrison was presented with Ellison's proposed removal letter and was subsequently escorted from the building.  (Pl.'s Opp'n to Def.'s Mot. to Dismiss or for Summ. J. at 16, ECF No. 30.)  On March 20, 2009, SSA management accepted Ellison's recommendation for Morrison's removal from federal service.  (Compl. ¶ 18.)  Morrison was formally discharged from the SSA March 23, 2009.  (*Id.*)  Following her removal, Morrison amended her formal EEO complaint to include allegations that her termination was discriminatory and was an act of retaliation in response to her earlier discrimination charge.  (*Id.* ¶ 19.)  The EEO accepted this amendment and designated the case as a mixed case.  (Def.'s Mot. to Dismiss or for Summ. J. at 9.)

Following investigation of Morrison's claim of discrimination based on age, marital status, parental status, race, and sex resulting in a hostile work environment and discriminatory discipline, removal, and retaliation, the EEO found no probable cause to sustain her allegations.  (*Id.*; Compl. ¶ 19.)  Morrison timely appealed to the Merit Systems Protection Board ("MSPB").  (Compl. ¶ 19.)  Following a three-day hearing in which ten witnesses testified, including witnesses on Morrison's behalf, the MSPB affirmed the EEO's finding against Morrison.  (*Id.*)  Morrison then filed this complaint October 10, 2010, alleging differential treatment on the basis

11

of race and gender and unlawful retaliation under Title VII.[2]  (*Id.* ¶¶ 23–28, 34.)  She seeks

compensatory damages, plus legal fees, and any other relief to which the court thinks she is

entitled.  (*Id.* ¶¶ 30, 35.)   Now pending before the court is defendant SSA Commissioner

Michael J. Astrue's motion to dismiss or for summary judgment.

## STANDARD OF REVIEW

I.      Motion to Dismiss[3]

"[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to

resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."

*Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotation marks

and alterations omitted) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir.

1999)).  To survive a motion to dismiss, the factual allegations of a complaint "must be enough

to raise a right to relief above the speculative level, . . . on the assumption that all the allegations

in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

555 (2007) (internal citations and alterations omitted).  Thus, the plaintiff's obligation is to set

forth sufficiently the "grounds of his entitlement to relief," offering "more than labels and

---

[2] In her complaint before this court, Morrison declined to pursue the additional allegations of
discrimination on the basis of age, marital status, and parental status that were raised in her Equal
Employment Opportunity ("EEO") complaint.
[3] Defendant Astrue moved to dismiss Morrison's complaint under both Federal Rule of Civil
Procedure 12(b)(1) and 12(b)(6).  Rule 12(b)(1) governs dismissal for lack of subject matter
jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).  Motions to dismiss for failure to exhaust
administrative remedies are governed by Rule 12(b)(1).  *See Jones v. Calvert Grp., Ltd.*, 551
F.3d 297, 300 (4th Cir. 2009); *Khoury v. Meserve*, 268 F. Supp. 2d 600, 606 (D. Md. 2003).  In
this case, Morrison timely pursued both an EEO complaint and an appeal to the Merit Systems
Protection Board ("MSPB") before filing in federal district court.  She therefore did not fail to
exhaust administrative remedies prior to filing this complaint.  Defendant does not appear to
dispute this fact.  This court otherwise has subject matter jurisdiction pursuant to 28 U.S.C.
§ 1331.  Accordingly, I will treat the motion to dismiss as arising under Rule 12(b)(6).

conclusions." *Id.* (internal quotation marks and alterations omitted).  It is not sufficient that the

well-pleaded facts suggest "the mere possibility of misconduct."  *Ashcroft v. Iqbal*, --- U.S. ---,

129 S. Ct. 1937, 1950 (2009).  Rather, to withstand a motion to dismiss, "a complaint must

contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

face," meaning the court could draw "the reasonable inference that the defendant is liable for the

conduct alleged." *Id.* at 1949 (internal quotations and citation omitted).

When ruling on such a motion, the court must "accept the well-pled allegations of the

complaint as true," and "construe the facts and reasonable inferences derived therefrom in the

light most favorable to the plaintiff."  *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

The court need not, however, "accept the legal conclusions drawn from the facts, and [it] need

not accept as true unwarranted inferences, unreasonable conclusions or arguments."  *Giarratano*

*v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

Where the court considers matters outside the pleadings, a defendant's motion to dismiss

will be treated as one for summary judgment under Rule 56.  *See* Fed. R. Civ. P. 12(b) & (c);

*Gay v. Wall*, 761 F.2d 175, 1177 (4th Cir. 1985).  Assuming *arguendo* that plaintiff Morrison has

alleged facts establishing more than "the mere possibility of misconduct," *Iqbal*, 129 S. Ct. at

1950, such that her complaint would survive a motion to dismiss, the court's decision on

defendant's motion is based in large part on consideration of the substantial evidence amassed in

the underlying administrative hearing.  Defendant Astrue's motion to dismiss or for summary

judgment will therefore be analyzed as one for summary judgment according to Rule 56.

II.     Summary Judgment

A court may properly award summary judgment when "the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  While the burden is on the moving party to demonstrate the absence of any genuine issue of material fact, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), a court should enter summary judgment where a party fails to make a sufficient showing to establish the elements essential to the party's claim and on which the party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322.  The "mere existence of a scintilla of evidence in support of plaintiff's position" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Moreover, the non-moving party may not merely rest upon allegations or denials in her pleadings but must, by affidavit or other evidentiary showing, set out specific facts showing a genuine issue remains for trial. Fed. R. Civ. P. 56(e)(2).  If there is insufficient evidence for a reasonable jury to render a verdict in favor of the non-moving party, there is no genuine issue of material fact, and summary judgment may be granted. *See Anderson*, 477 U.S. at 248.  When reviewing a motion for summary judgment, the court must look at the facts and inferences drawn therefrom in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 373, 378 (2007).

ANALYSIS

I.      Discrimination on the Basis of Race and Sex

Title VII prohibits discrimination based on race and sex and retaliation based on the exercise of federally protected rights.  42 U.S.C. § 2000e–2(a) et seq.  A Title VII plaintiff may survive a motion for summary judgment either by offering direct evidence of discrimination or by satisfying the *McDonnell Douglas* burden-shifting framework. *Causey v. Balog*, 162 F.3d 795, 800 (4th Cir. 1998).  Here, Morrison has not put forth any direct evidence of discriminatory intent, so her claim is reviewed under the *McDonnell-Douglas* approach.

14

According to *McDonnell Douglas*, the plaintiff must first prove a *prima facie* case of discrimination by a preponderance of the evidence. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the plaintiff successfully establishes a *prima facie* case, the burden shifts to the employer to state a legitimate, nondiscriminatory explanation for the adverse employment action. *Id.* If the employer provides a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to establish by a preponderance of the evidence, *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000), that the defendant's proffered explanation is pretextual. *McDonnell Douglas*, 411 U.S. at 804. A plaintiff's unsubstantiated allegations and bald assertions are insufficient to defeat a motion for summary judgment, *Jacobsen v. Towers Perrin Forster & Crosby, Inc.*, No. RDB-05-2983, 2008 WL 782477, at *10 (D. Md. March 20, 2008) (citing *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996)), because a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted). If the plaintiff fails to present facts that permit a reasonable inference of pretext, summary judgment should be granted in defendant's favor. *Jacobsen*, 2008 WL 782477, at *10 (citing *Rowe v. Marley Co.*, 233 F.3d 825, 830 (4th Cir. 2000)).

a.   *Prima Facie* Case

To establish a *prima facie* case, the plaintiff must prove that (1) she is a member of a protected class; (2) she performed her job in a satisfactory manner; (3) she was subjected to adverse employment action; and (4) she was treated differently from similarly situated individuals outside of her protected class. *McDonnell Douglas*, 411 U.S. at 802; *White v. BFI Waste Serv., LLC*, 375 F.3d 288, 295 (4th Cir. 2004).

Morrison alleges that, as a black woman, she is a member of a protected category, and she was subjected to adverse employment action in the form of a hostile work environment and disparate treatment with regard to training and disciplinary action.  Defendant Astrue does not dispute that Morrison is a member of a protected category, but he contends that Morrison cannot establish the remaining two elements required of a *prima facie* case: that she was meeting her job expectations and that similarly situated employees were treated differently.  Astrue also disputes Morrison's claim that Ellison's comments and increased supervision amounted to a hostile work environment.

    1.  Hostile Work Environment

To make out a claim of hostile work environment, the plaintiff must be subjected to repeated, intense harassment over the course of days, months, or even years.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).  A determination of hostile work environment requires consideration of the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)) (internal quotation marks omitted).  The plaintiff must show not only that she found the environment hostile or abusive but also that "a reasonable person in [her] position would have found the environment hostile or abusive."  *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (internal quotation marks and citation omitted).  "Simple teasing, offhand comments, and isolated incidents (unless extremely serious)" will not suffice to make out a claim for hostile work environment, and "[c]allous behavior by one's superiors or a routine difference of opinion

and personality conflict with one's supervisor" are not actionable under Title VII.  *Id.* at 315–16 (internal quotation marks and citation omitted).

Taking Morrison's alleged facts as true, she was subjected to close scrutiny and occasionally harsh criticism over the course of several months.  Morrison's experience working under Ellison caused her to suffer humiliation and embarrassment, resulting in significant stress both on and off the job.  Morrison contends that the work-related criticism and Ellison's comments about Morrison's daughter and grandson resulted from racial stereotyping indicative of discriminatory animus.

Ellison's close scrutiny and ongoing criticism of Morrison's work, sometimes expressed publicly at status meetings, would surely cause anyone stress.  Ellison's criticisms may even have felt "hostile" in the context of increasing levels of ongoing performance review.  This degree of scrutiny and criticism, and Ellison's comments about Morrison's daughter and grandson, however, were not sufficiently severe or pervasive to support a hostile work environment claim.

In *LaRosa v. Harford County*, this court held that degrading, anti-Italian name-calling[4] and excluding an Italian employee from workplace prayer and company training was harassment but was insufficiently severe and pervasive to constitute a hostile work environment.  *See LaRosa v. Harford Cnty*, No. CCB-08-2560, 2010 WL 1375321, at *7 (D. Md. March 26, 2010). By contrast, the Fourth Circuit held that frequent anti-Muslim name-calling, regular ridicule, interference with the employee's computer and timecard, and defacing of the employee's

---

[4] Mr. LaRosa was called a "greasy wop," "f-cking dego," and "bast-d Italian" several times. *LaRosa v. Harford Cnty*, No. CCB-08-2560, 2010 WL 1375321, at *7 (D. Md. March 26, 2010).

business cards did constitute a hostile work environment when the plaintiff's coworkers called him offensive names on a daily basis.  *Sunbelt Rentals*, 521 F.3d at 315.

Though the anti-Italian comments in *LaRosa* were severe, the court found them to be insufficiently frequent to rise to the level of pervasiveness required in a hostile work environment claim.  In *Sunbelt Rentals*, however, the comments and conduct to which the plaintiff was subjected were severe, explicitly anti-Muslim, and frequent.  Unlike the directly anti-Italian comments in *LaRosa*, which the court found insufficient to create a hostile work environment, Ellison's references to Morrison's daughter and grandson do not reasonably suggest discriminatory animus.  Moreover, while Ellison's comments were arguably inappropriate and even offensive, the frequency of Ellison's comments was insufficient to be considered severe and pervasive, and there is no indication that discriminatory animus was the basis for the ongoing review of Morrison's performance.  Thus, Ellison's comments, close scrutiny, and supervision, though stress-inducing for Morrison, cannot be characterized as sufficiently abusive to constitute a hostile work environment.  Looking at the facts in the light most favorable to Morrison, the totality of the circumstances is not indicative of a hostile work environment.

2.   Disparate Treatment Claims

In addition to the hostile work environment claim, Morrison contends that she was subjected to differential treatment in her access to training and in the discipline she received.  In support of her differential treatment claims, Morrison must identify similarly situated employees who were treated differently.  *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 298 (4th Cir. 1998).  It is not enough to simply identify employees who are not in the protected category and received

different treatment; those comparators must also share the poor time management and other

mistakes allegedly attributed to the plaintiff.  *See id.*  As comparators, Morrison cites Tammy

Meisner, a white woman, and Brandi Solomon, a black woman, for differential access to

training.  (Pl.'s Answer to Interrog. 14, ECF No. 20-83.)  For differential discipline comparators,

Morrison cites Bob Myers, her white male supervisor, and Theresa Hill, an Asian woman.  (*Id.*)

     i.     Disparate Treatment with Respect to Access to Training

The Fourth Circuit has recognized that decisions regarding "entry into training programs"

can be a basis for a disparate treatment claim.  *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981)

(en banc).  With respect to her access to training, Morrison claims that Ellison recommended

training as part of the PAP and OPS but then did nothing to facilitate access to it.  (Appellant's

Prehr'g Submission, Merit Sys. Prot. Bd., at 8, ECF No. 30-3.)  When Morrison specifically

asked for Excel training, both Ellison and Myers said that it wouldn't be necessary because

Morrison would just "pick it up."  Morrison cites no examples of comparators who were given

access to Excel training.  Moreover, Morrison admits that Myers spent six months training her

when she first transferred to Release Planning but contends that Tammy Meisner ("Meisner")

was given more training and a mentor for a longer period of time.  In addition to the fact that

Meisner does not appear to be a useful comparator because, unlike Morrison, she had no

experience in the IT field, it is uncontested that, after six months of training with Myers,

Morrison also received two mentors, Charlotte Bark and Mary DeTota.  Morrison's comparison

to Meisner therefore rings hollow as an example of disparate access to training and mentors.

Finally, Morrison contends that Brandi Solomon, who is, in Morrison's words, a "light-skinned"

black woman, was given preference in a class on structured writing.  (Appellant's Prehr'g

Submission, Merit Sys. Prot. Bd., at 8.)  Though Morrison was signed up for the class, at the last

minute, Solomon was instructed to take her place.  (*Id.*)  Morrison's single example of being

removed from one training class provides no evidence that the decision to remove her was

motivated by race.  *See Presley v. BellSouth Telecomm., Inc.*, No. 98-1016, 1998 WL 610873, at

*4 (4th Cir. Sept. 3, 1998) (holding that an employer's decision to deny access to a training

opportunity on one occasion is insufficient to support a disparate treatment claim).  Morrison has

therefore failed to establish that she was subjected to disparate treatment with regard to access to

training.

      ii.     Disparate Treatment with Respect to Discipline

To establish a *prima facie* case of disparate discipline, the plaintiff must show, in addition

to membership in a protected category, that the conduct for which she was disciplined was

comparable in seriousness to misconduct of employees outside the protected class, and that the

disciplinary measures used against her were more severe than those used against the comparator

employees.  *Lightner v. City of Wilmington*, 545 F.3d 260, 264–65 (4th Cir. 2008).  The

similarity of comparators and the seriousness of their respective offenses must be clearly

established to be meaningful in a Title VII analysis.  *Id.* at 265.

In support of her allegation of disparate discipline, Morrison cites Bob Myers, her white

male supervisor, and Theresa Hill, an Asian woman.  There is no evidence that Myers is a

relevant comparator because he is a supervisor, *see Lightner*, 545 F.3d at 265 (holding that,

where one police officer is in a commander position and the other is not, the commander is not

an apt comparator), and there is no evidence that he made mistakes with the same frequency that

Morrison did.  Morrison cites only two emails in which Myers included the wrong date.

(Appellant's Prehr'g Submission, Merit Sys. Prot. Bd., at 11, ECF No. 30-3.)  Morrison's only

evidence of Theresa Hill's mistakes is one email that was inappropriately flagged, causing Ellison to respond that she would "review it with Theresa again." (*Id*.)  To Morrison's knowledge, Ellison did not engage in any further discipline or scrutiny with respect to Ms. Hill. Both Myers and Hill are reported to have made isolated mistakes, whereas several witnesses testified to Morrison's repeated mistakes and inability to grasp her responsibilities with the email inbox and tracking spreadsheets.  Morrison's only witnesses, Tatia Little and Janet Maszaros, women who did not work with Morrison on a regular basis, do not suffice to refute that evidence. Thus, neither Myers nor Hill serves as a relevant comparator for the purpose of determining whether Morrison was subjected to disparate discipline.

Viewing the facts in the light most favorable to Morrison, she has failed to raise a material issue of fact regarding alleged disparate treatment on the basis of access to training or discipline.  Morrison has therefore failed to establish a *prima facie* case of discrimination for disparate treatment.

b.   Burden Shifts to the Employer

Even assuming for the sake of argument that Morrison met her burden in establishing a *prima facie* case of discrimination, defendant Astrue has satisfied the burden of production to provide a legitimate, nondiscriminatory reason for the allegedly disparate treatment to which Morrison claims she was subjected.  Poor performance on the job is "widely recognized as a valid, non-discriminatory basis for any adverse employment decision." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996).

The SSA represents that Morrison was consistently confused about her responsibilities, was late or failed to participate in mandatory meetings, and suffered from a lack of time

management skills.  Indeed, over the course of both the PAP and the OPS, Morrison's mentors

counseled her about improving her methods of tracking software development and

communicating with her supervisors, but neither DeTota nor Bark noticed any marked

improvement.  Myers and Chase both testified as to Morrison's inability to handle crucial tasks

in a timely manner, a failing that resulted in Myers having to do work that would otherwise have

been Morrison's responsibility.  In her copious notes and emails shared with Morrison and

discussed at performance review meetings, Ellison carefully documented the areas in which

Morrison would need to improve during the PAP and OPS.  Despite seeing some improvement

week-to-week, even occasionally noting "vast improvement" in some areas, Ellison and the SSA

ultimately determined that Morrison's skill level was not commensurate with her GS-12 status,

and she was unable to work sufficiently independently.  Morrison's frequent mistakes and failure

to timely and accurately track software development according to her job responsibilities served

as the basis for putting Morrison into the PAP and OPS.  Ultimately, Morrison's inability to

show satisfactory improvement by the end of the OPS period constitutes SSA's legitimate,

nondiscriminatory explanation for her removal.  Thus, even if Morrison had been able to carry

her burden in proving a *prima facie* case, to survive summary judgment, Morrison would have to

present evidence that the SSA's explanation for her discipline and removal is pretextual.

c.   Pretext

When an employer offers a legitimate, non-discriminatory reason for adverse

employment action, the burden shifts back to the complainant employee who "must then bear the

'ultimate burden of persuasion' and show by a preponderance of the evidence that the

defendant's explanations are pretextual or otherwise unworthy of credence."  *Henson v. Liggett*

*Group, Inc.*, 61 F.3d 270, 275 (4th Cir. 1995) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S.

502, 511 (1993)).  The Fourth Circuit has held that to establish that an employer's "proffered

reason for the challenged action is pretext for discrimination, the plaintiff must prove '*both* that

the reason was false, *and* that discrimination was the real reason' for the challenged conduct."

*DeJarnette*, 133 F.3d at 298 (quoting *Jimenez v. Mary Washington Coll.*, 57 F.3d 369, 377–78

(4th Cir. 1995) (internal quotations omitted) (emphasis in original).

"While reviewing the employer's articulated reasons for discharge and the plaintiff's

refutation thereof, [the court] must keep in mind that 'Title VII is not a vehicle for substituting

the judgment of a court for that of the employer.'"  *Id.* at 298–99 (quoting *Jimenez*, 57 F.3d at

377 (4th Cir. 1995)).  "Particularly, this Court 'does not sit as a kind of super-personnel

department weighing the prudence of employment decisions made by firms charged with

employment discrimination . . . .'"  *Id.* at 299 (quoting *Giannopoulous v. Brach & Brock

Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997)).  Furthermore, it is not enough for the

employee to rely on her own opinion and her coworkers' opinions that she was an average or

good employee.  *See id.*  What is relevant is the perception of the decisionmaker, not the self-

assessment of the plaintiff.  *Id.* (holding that the plaintiff's perception of herself and the

perceptions of her coworkers are "close to irrelevant"); *Hawkins v. PepsiCo., Inc.*, 203 F.3d 274,

280 (4th Cir. 2000) (same).

In attempt to show that the SSA's criticism of her performance is merely pretext for

discrimination, Morrison offers her own opinion of her work, substantiated by evidence of prior

satisfactory performance reviews and the testimony of two witnesses, Tatia Little and Janet

Maszaros.  Prior to her move to Release Planning, Morrison received regularly timed increases in

paygrade and satisfactory reviews.  Morrison's relative success in the Information Development

branch, however, does little to indicate that she performed successfully in her new job, with

different responsibilities, in Release Planning.  The skills needed and the work done in

Information Development were of a different kind than what was expected of her after her

transfer to Release Planning in 2007.  The fact that she received passing performance reviews

from Nicodemus in Information Development is not indicative of her performance under Ellison

in Release Planning.

In addition to the prior performance reports, Morrison offers the supportive testimony of

two witnesses.  Tatia Little, a friend of Morrison's who worked in another division in another

building, submitted an affidavit in which she testified that Morrison's spreadsheets and emails

appeared to be accurate.  Janet Maszaros, a computer specialist team leader who worked with

Morrison in 2000 or 2001 and subsequently had only infrequent contacts with her, submitted an

affidavit testifying that she found Morrison to be professional, timely, and knowledgeable.

Given that coworkers' testimony as to an employee's job performance is "close to irrelevant,"

*DeJarnette*, 133 F.3d at 299, Little's testimony and Maszaros's testimony do not create a

genuine issue of fact for trial.  Therefore, taking the facts in the light most favorable to Morrison,

there is insufficient evidence to suggest that the SSA's explanation for its employment decision

was pretextual.  "The mere existence of a scintilla of evidence in support of the plaintiff's

position will be insufficient [to survive summary judgment]; there must be evidence on which

the jury could reasonably find for the plaintiff."  *E.E.O.C. v. Clay Printing*, 955 F.2d 936, 943

(4th Cir. 1992).  Despite a well-developed factual record in the underlying administrative

hearing, Morrison has failed to make her case such that a reasonable jury could find a *prima*

*facie* case of discrimination or find that the SSA's explanation for its adverse employment actions was merely pretextual.[5]

Defendant Astrue's motion for summary judgment will therefore be granted as to the Title VII claim of hostile work environment and disparate treatment on the basis of race and sex.

## II.    Retaliation

To establish a *prima facie* case of retaliation, the plaintiff must show that (1) she engaged in a protected activity; (2) management was aware of this protected activity; (3) adverse action was taken against the plaintiff; and (4) the adverse action was taken as a result of the protected activity.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006); *Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373, 392 (4th Cir. 2001).  As with the discrimination claim above, if the plaintiff carries this burden, the employer must then offer a legitimate, nondiscriminatory reason for the alleged retaliatory action, and the plaintiff may respond by showing that the explanation is merely pretextual.  *Jimenez v. Mary Washington Coll.*, 57 F.3d 369, 377–78 (4th Cir. 1995).

Morrison has failed to meet this burden.  Morrison alleges that she was disciplined and ultimately removed from federal service in retaliation for requesting EEO counseling on August

_____

[5] After the development of a robust administrative record, Morrison now requests that the court grant time for additional discovery as to the race and gender of her replacement and as to the extent of her interactions with Maszaros.  (Decl. John H. Morris, Jr., ECF No. 30-2, at 2.)  This additional discovery could not make a material difference in the outcome of the court's analysis. Even assuming the race and gender of Morrison's replacement are something other than Morrison's race and gender, the fact remains that Morrison was not fulfilling her responsibilities at work according to the established standards of the SSA and the detailed requirements repeated to her by Ellison, Myers, and her mentors, DeTota and Bark.  Whether or not Maszaros had more extensive contact with Morrison is equally irrelevant to the determination because it is not the court's role to second guess personnel decisions in the absence of alternative explanations.  Thus, additional discovery is not necessary when the facts expected to be borne out by that additional discovery would be immaterial to the disposition of the case.

14, 2008 after being placed under the PAP earlier that month.  The EEO conducted a preliminary

inquiry, which lasted through November 2008.  As part of the EEO investigation, Ellison was

interviewed on November 6, 2008.  Morrison filed a formal EEO complaint November 20, 2008,

and Ellison was notified of the existence of the complaint as of March 11, 2009, when the EEO

decided to accept the formal investigation.  Ellison was therefore aware of Morrison's protected

EEO activity as early as November 6, 2008, and Morrison's performance review periods

ultimately ended in her removal from federal service.  Thus, Morrison is able to establish the first

three elements of a *prima facie* case.  Her argument falls short, however, on the final element:

showing that the adverse employment action was taken because of the protected activity.

Morrison alleges that Ellison's increased scrutiny and supervision were in response to the

EEO filing in August, yet Morrison also asserts that Ellison began criticizing her shortly after

Morrison was assigned to Release Planning.  Ellison initially brought up performance problems

in the April review and then met with Morrison again in July to discuss the possibility of a PAP.

Morrison was formally placed under review as of early August, before she first made contact

with the EEO and at least two months before Ellison was interviewed in connection with the

EEO inquiry.  Morrison's removal was ultimately recommended on February 6, 2009, following

the proper agency protocol of both a 30-day PAP and a 120-day OPS, over a month before the

EEO formally accepted Morrison's complaint on March 11, 2009.  Ellison and SSA management

were not yet even aware that the EEO investigation would be formalized when they made the

proposal to remove Morrison.  Even though the SSA affirmed the proposal to remove March 20,

2009, nine days after management was notified of the formal EEO investigation, the bulk of the

evidence fails to indicate that the timing of the performance review periods and the removal were

motivated by retaliation.

Moreover, neither the timing of the performance review period, nor the increased supervision itself, is indicative of retaliation based on discrimination.  Discriminatory animus cannot be inferred from the day-to-day conduct of a supervisor that Morrison finds to be overbearing.  *See Settle v. Baltimore Cnty*, 34 F. Supp. 2d 969, 991 (D. Md. 1999); *Spence v. Maryland Cas. Co.*, 803 F. Supp. 649, 670 (W.D.N.Y. 1992) (holding that a manager's intimidating behavior may be evidence that he or she is impersonable or overly aggressive, but without more it does not indicate discriminatory animus) (*aff'd* 995 F.2d 1147 (2d Cir. 1993)).  Title VII does not protect plaintiffs from dissatisfaction and annoyance arising from a "strict or even personally insufferable and demanding supervisor."  *Id*.  Therefore, looking at the facts in the light most favorable to Morrison, there is nothing that indicates that the performance review and removal were retaliatory or that the SSA's proffered explanation was pretextual.

III.    Conclusion

In summary, Morrison's experience suggests not discrimination but an uncomfortable period of heightened performance review that ultimately resulted in a finding of insufficient skill level and unsatisfactory work product.  Because Morrison has failed to make out a *prima facie* case of either discriminatory disparate treatment or retaliation in violation of Title VII, defendant Astrue's motion for summary judgment is granted.

December 27, 2011
Date

J. Frederick Motz
United States District Judge